## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

In re:                                              )
                                                    )        Case No. 19-10653
INNOVA GLOBAL INC.,                                 )
                                                    )        Chapter 15
    Debtor in a foreign proceeding.             )
                                                    )
_____ )

### MOTION OF ATLANTIC SPECIALTY INSURANCE COMPANY FOR RELIEF FROM STAY TO ALLOW FOR TERMINATION OF CONTRACT AND USE OF BONDED CONTRACT FUNDS, REQUEST FOR WAIVER OF STAY OF ORDER PURSUANT TO RULE 4001(A)(3), AND NOTICE OF OPPORTUNITY FOR HEARING

Movant, Atlantic Specialty Insurance Company ("Atlantic"), files this Motion for Relief from the Stay (the "Motion") supported by the Affidavits of Terrance J. Dahl and Nicholas Tonzetich attached hereto as Exhibits F & G, respectively, and states as follows:

### PARTIES

1.      Atlantic is a New York corporation with its principal place of business in Plymouth, Minnesota. At all relevant times hereto, Atlantic was a surety company engaged in the business of issuing surety bonds on behalf of contractors engaged in the business of construction for construction projects throughout the United States.

2.      On April 1, 2019, the Debtor Innova Global, Inc. ("Debtor"), among others, were placed into a receivership proceeding in the Court of Queen's Bench of Alberta in the Judicial Centre of Calgary Canada, Court File No. 1901-04589 ("Canadian Proceedings") under section 243(1) of the Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, and section 13(2) of the Judicature Act, R.S.A. 2000, c. J-2. PricewaterhouseCoopers Inc., LIT ("PWC") was appointed as the Receiver ("Receiver") in the Canadian Proceedings.  On April 4 the Receiver filed a

voluntary petition for recognition of foreign proceedings under chapter 15 of title 11 of the United States Bankruptcy Code in this Court.

## JURISDICTION AND CHOICE OF LAW

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.

4.      This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

5.      This Motion is filed under 11 U.S.C. §§ 362, 1519(a), and 1520, B.R. 4001(d), and Local Bankruptcy Rule 4001-1, 9013-1.

6.      The Contracts, as defined below, provide that "The Contract shall be governed by, and construed in accordance with the laws of the State of Connecticut." *See* Contracts, attached hereto as Exhibits A and C, §54, General Specifications CT17-5000.

## BACKGROUND FACTS

7.      At all relevant times hereto, the Debtor was in the business of, among other things, designing, supplying and installing certain pre-engineered buildings on construction projects throughout the United States.

8.      On or about May 12, 2017, Debtor and PSEG Power Connecticut, LLC ("PSEG"), entered into a contract ("Admin Contract") for Debtor to perform certain construction services for the project commonly known as the Admin/Control/Aux Electric Pre-Engineered Metal Buildings in connection with Bridgeport Harbor Unit 05 ("BH5") in Bridgeport, Connecticut (the "Admin Project"). A true and correct copy of the Admin Contract is attached hereto as Exhibit A.

9.      At the request of Debtor, Atlantic, as surety, issued payment and performance bond no. 917105006 / 800017133 for the benefit of PSEG, as obligee, guaranteeing Debtor's payment and performance obligations of the Admin Contract for the Admin Project in the penal sum amount of Six Million Nine Hundred Seventy Thousand Three Hundred Fifty-Six and

00/100 Dollars ($6,970,356.00) ("Admin Bond"). A true and correct copy of the Admin Bond is attached hereto as Exhibit B.

10.    On or about May 22, 2017, Debtor and PSEG also entered into a contract ("Turbine Contract") for Debtor to perform certain construction services for the project commonly known as the Turbine/Generator Pre-Engineered Metal Buildings in connection with BH5 in Bridgeport, Connecticut (the "Turbine Project"). A true and correct copy of the Turbine Contract is attached hereto as Exhibit C.

11.    At the request of Debtor, Atlantic, as surety, issued payment and performance bond no. 917105007 / 800017134 for the benefit of PSEG, as obligee, guaranteeing Debtor's payment and performance obligations of the Turbine Contract for the Turbine Project in the penal sum amount of Fourteen Million Eight Hundred Thirty-One Thousand Three Hundred Ten and 00/100 Dollars ($14,831,310.00) ("Turbine Bond"). A true and correct copy of the Bond is attached hereto as Exhibit D.

12.    The Admin Contract and Turbine Contract shall collectively be referred to herein as the "Contracts". The Admin Project and the Turbine Project shall collectively be referred to herein as the "Projects". The Admin Bond and the Turbine Bond shall collectively be referred to herein as the "Bonds".

13.    As a condition precedent to issuing the Bonds on behalf of Debtor, on or about April 8, 2016, the Debtor, among others, executed a General Application and Indemnity Agreement in favor of Atlantic ("Indemnity Agreement"). A true and correct copy of the Indemnity Agreement is attached hereto as Exhibit E.

14.    During Debtor's performance of the Contracts on the Projects, on August 17, 2018, PSEG assessed liquidated damages due to delays in performance by the Debtor. PSEG's

delay liquidated damages claims total $2,274.621.00 ("PSEG LD Claims"). PSEG therefore alleges there is no remaining balance on the Contracts and, in fact, the Debtor owes PSEG monies due to the PSEG LD Claims.

15.     Debtor asserted certain claims against PSEG for additional compensation under the Contracts. Debtor disputes some, if not all, of the PSEG LD claims and alleges there are Contract Balances remaining.  PSEG disputes Debtor's claims for additional compensation and disputes any claims that there are additional Contract Balances due from PSEG under the Contracts. Atlantic reserves its and the Debtor's rights, claims and defenses related to PSEG LD Claims and the Debtor's claims against PSEG.

16.     During Debtor's performance of the Contracts on the Projects, on April 12, 2019, PSEG declared Debtor in default of the Contracts for, among other things, the Debtor's failure to perform its Contracts in accordance with the contract documents, and Debtor's failure to pay its vendors, subcontractors and materialmen the contract funds the Debtor received from PSEG.

17.     Then, on April 12, 2019, PSEG then made a claim against the Bonds, notifying Atlantic that it had declared Debtor in default of the Contracts and demanding, among other things, that Atlantic perform Debtor's remaining work under the Contracts pursuant to the terms of the Bonds.

18.     The Bonds provide, in relevant part:

> 1.     …Upon making a demand on this Bond, the Owner shall make the Contract Balance (the total amount payable by the Owner to the Contractor pursuant to the Contract less amounts properly paid by the Owner to the Contractor) available to the Surety for completion of the Work.

> 2.     If the Contractor is in default pursuant to the Contract and Owner has declared the Contractor in default, the Surety may promptly remedy the default or shall:

      a.      Arrange for the Contractor to complete the Work, with consent of the Owner;

      b.      Arrange for the completion of the Work by a Contractor acceptable to the Owner and secured by performance and payment bonds acceptable to the Owner and issued by a qualified surety. The Surety shall make available sufficient funds to pay the cost of completion of the Work less the Contract Balance, up to the Penal Sum; or

      c.      Waive its right to complete the Work, and reimburse the Owner the amount of its reasonable costs to complete the Work, less the Contract Balance, not to exceed the Penal Sum.

*See* Bonds, § 2, attached hereto as <u>Exhibits B and D</u>.

19.     Similarly, the Indemnity Agreement provides that "in the event of the…breach of any Bonded Contracts or the breach of any Bonds…" Atlantic is entitled "to complete the Bonded Contracts or cause the same to be completed…" *See* Indemnity Agreement, ¶ 8(c), attached hereto as <u>Exhibit E</u>.

20.     On April 1, 2019, the Debtor, among others, were placed into the Canadian Proceedings, and on April 4, 2019 PWC commenced this Chapter 15 proceeding.

21.     On April 5, 2019, this Court entered its *Order Granting Receiver's Emergency Ex Parte Application for Temporary Restraining Order and Relief Pursuant to Sections 105(A) and 1519 of the Bankruptcy Code* (docket #13) (the "TRO"), effectively imposing relief similar to the automatic stay of 11 U.S.C. § 362(a) pending recognition of the Canadian Proceedings, at which time relief would be afforded the Receiver and the Debtor under 11 U.S.C. § 1520.

22.     On April 18, 2019, the Court entered its *Order Granting Petition for Recognition as Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the United States Bankruptcy Code and Related Relief* (docket #54) ("Recognition Order"), granting the Receiver

all relief afforded under 11 U.S.C. § 1520. The entry of the Recognition Order superseded the TRO. It is the stay imposed by the TRO, Recognition Order, and by 11 U.S.C. § 1520, which imposes the automatic stay of *id*. § 362(a), from which relief is sought by this Motion.

23.     By the express terms of the Recognition Order, the stay imposed by the Recognition Order does not apply to PSEG completing the Debtor's remaining scope of work under the Contracts.

24.     The stay imposed by the Recognition Order does, however, apply to Atlantic's ability to exercise its rights under the Contracts and the Bonds, including among other things to utilize any Contract Balances, if any may exist, and to complete the Debtor's remaining scope of work under the Contracts, and applies to PSEG's right to terminate the Contracts under the terms thereof and applicable law and, in accordance with the terms of the Contracts, the Bonds, Indemnity Agreement and applicable law, to pay Atlantic any Contract Balances, if any exist after resolution of PSEG LD Claims.

25.     If any Contract Balances remain to be paid, payment of such Contract Balances from PSEG to Atlantic is necessary to trigger Atlantic's obligations under the Bonds and for Atlantic to utilize such Balances to complete Debtor's remaining scopes of work under the Contracts on the Projects pursuant to its option under the Bonds.

26.     Termination of the Contracts and allowing Atlantic to complete the Debtor's remaining scope of work under the Contracts is necessary in order for PSEG and Atlantic to mitigate their damages. Similarly, such relief is necessary in order to minimize claims against the Debtor.

27.     Pursuant to Section 39 of the General Specifications, CT17-500, of the Contracts, PSEG has the right, among other things, to terminate the Contracts for cause by written notice to

Debtor, provided that Debtor has failed to cure any default within five (5) business days of the date of the Debtor's receipt of PSEG's notice of default, if Debtor:

    a.    Becomes insolvent or makes a general assignment for the benefit of creditors; or files or has filed against it a petition in bankruptcy; or

    b.    Is adjudged bankrupt or if its affairs are placed in the hands of a receiver, trustee, or assignee for the benefit of creditors; or

    c.    Refuses or persistently or repeatedly fails to provide the Work or Materials in a timely manner; or

    d.    Refuses or persistently or repeatedly fails to provide enough properly skilled workers, supervisory personnel or proper Materials; or

    e.    Neglects or abandons the Work; or

    f.    Fails to make prompt payment to Subcontractors; or

    g.    Fails to comply with applicable laws, including ordinances and regulations, or the instructions of the Company; or

    h.    Is unable to perform the Work, fails to provide adequate assurance of future performance, fails to adhere to the Project Schedule; or

    i.    Becomes involved in litigation or labor problems which, in the Company's opinion, will delay or adversely affect the Work; or

    j.    Refuses or persistently or repeatedly fails to provide the Work in a safe manner; or

    k.    Is guilty of a substantial violation of any provision of the Contract.

*See* Contracts, attached hereto as <u>Exhibits A and C</u>, § 39 of the General Specifications, CT17-500.

28.     As noted above, PSEG gave the Debtor written notice of default on April 12, 2019.

29.     More than five days have passed since PSEG gave the Debtor its notice of default, and the Debtor failed to take any action to remedy the default. To the contrary, the Receiver has advised that the Debtor is not able to perform. Accordingly, PSEG has the right to terminate the Contracts with the Debtor. *See* Contract, General Specifications, CT17-500, § 39, <u>Exhibit A</u> and <u>C</u> hereto.

30.     Atlantic, too, has the right to seek termination of the Contracts, pursuant to its equitable subrogation rights, so as to enable Atlantic to re-let the Contracts and facilitate the completion of the Projects.

31.     The Debtor and the Receiver both lack the financial wherewithal to perform under the Contracts on the Projects. Atlantic and PSEG has been advised by the Receiver that the Debtor has ceased doing business and so the Receiver and Debtor have no intention on completing the work under the Contracts on the Projects.

32.     Atlantic has been informed, and upon such information believes and avers that the Projects are at a critical junction wherein the failure and/or ability of the Debtor to continue performance will substantially impede, hinder, delay and obstruct the progress and/or timely completion of the Projects.

33.     The Contracts provide that if the Projects are not timely completed by Debtor, liquidated damages will be assessed. For instance, failure to complete certain construction milestones will allow for the assessment of liquidated damages at $11,000 per day for the first seven days and then $14,000 per day thereafter. *See* Contracts, attached hereto as <u>Exhibit A and C</u>, General Specification 17-5000, 57 (3). Similarly, failure to meet the Substantial Completion

deadline allows for assessment of liquidated damages at $14,000 per day. *See* Contracts, attached hereto as <u>Exhibit A and C</u>, General Specification 17-5000, 57 (4).  PSEG to date has already assessed a claim against the Debtor for liquidated damages provided for under the terms of the Contracts in the amount of $2,274,621.00.

*34.*    The deadlines for completing work under the Contracts were April 1, 2018. The projects are part of construction of BH5 which is a power plant scheduled to become operational in June, 2019. If work to complete the Contracts is further interrupted, it has the potential to impact the plant project completion schedule.

35.    Atlantic estimates that the anticipated cost of completing the Debtor's remaining scope of work under the Contracts and the cost to pay Debtor's subcontractors, suppliers, and materialmen will exceed the amount of any Contract Balances held by PSEG for the completion of the Projects.

36.    Under applicable law, and as the anticipated cost of completing the Debtor's remaining scope of work under the Contracts and the cost to pay Debtor's subcontractors, suppliers, and materialmen, upon information and belief such costs may exceed the amount of any Contract Balances held by PSEG, and that to the extent that Atlantic expends funds under the Bonds, Atlantic has first priority to any Contract Balances in possession of PSEG, ahead of the Receiver or any secured creditor claiming a security or other interest in the Debtor's accounts and contract rights.

37.    In addition to the losses already addressed, if the project were is to be delayed further, PSEG and the public may suffer losses which may or may not result in claims against the Debtor if the failure to complete the contract work resulted in a delay of the BH5 becoming operational on schedule.  There is risk of loss of approximately $7.5 million to $9 million per

month due to lost energy and capacity sales.  Additionally, PSEG would be at risk of additional capacity penalties of $872k per hour during any ISO New England declared reserve deficiency (shortage) hours if the plant is not available to run when those occur. While shortage hours are extremely difficult to predict, ISO New England has published data that shows their expectations for shortage hours depending on available capacity (see figure 1 below). Based on ISO New England's data, the loss of availability of PSEG's BH5, which is a 484.3 MW unit for capacity purposes in the 2019-2020 planning year, would increase expected shortage hours during the year from 5.9 hours to 7.35 hours, or a 25% increase. This both puts additional financial risk of loss on PSEG as BH5's owner, and increases the risk of reserve shortage conditions potentially leading to loss of load (blackout) in ISO New England overall.



Figure 1:  Plot of Estimated Hours of System Operating Reserve Deficiencies Annually

38.     As such, Atlantic is seeking relief from the stay imposed by the Recognition Order and 11 U.S.C. §§ 362(a), 1520 to allow PSEG and Atlantic to exercise all their rights under the terms of the Contracts, the Bonds, the Indemnity Agreement and applicable law, so

that among other things (1) PSEG may terminate the Contracts; (2) Atlantic has the ability to complete the Debtor's remaining scope of work under the Contracts pursuant to its rights and obligations under the Bonds, Contracts, Indemnity Agreement and law; (3) Atlantic may utilize any Contract Balances, to the extent any Contract Balances exist, to complete the Debtor's remaining scope of work under the Contracts pursuant to its rights and obligations under the Bonds, Contracts, Indemnity Agreement and applicable law; and (4) PSEG may pay Atlantic any Contract Balances, to the extent any Contract Balances exist, pursuant to its rights and obligations under the Bonds, Contracts, Indemnity Agreement and applicable law.

39.     Atlantic has already agreed with the Receiver that, should relief be granted as requested herein, Atlantic will provide the Receiver with an accounting of its receipts and expenditures of the Contract Balances, and in the event the costs incurred by Atlantic to complete the Debtor's remaining scope of work under the Contracts does not exceed the Contract Balances, to remit any excess to the Receiver.

## LEGAL ANALYSIS

### A. Relief from the Stay is Warranted.

40.     Relief from the automatic stay may be granted either "for cause" or when "the debtor does not have equity in the property and the property is unnecessary to an efficacious reorganization." 11 U.S.C. § 362(d)(1), (2).

### i. "Cause" Exists to Lift the Stay Under Section 362(d)(1) of the Bankruptcy Code.

41.     Section 362(d)(1) permits lifting the automatic stay "for cause." 11 U.S.C. § 362(d)(1). "Cause" has not been defined by the Bankruptcy Code, therefore, "relief from stay for

cause is a discretionary determination made on a case by case basis." *In re Busch,* 294 B.R. 137, 140 (10th Cir. BAP 2003) (citing *Pursifull v. Eakin,* 814 F.2d 1501, 1506 (10th Cir.1987)).

42.     Among the factors to consider in determining whether the automatic stay should be modified for cause include: (1) an interference with the bankruptcy; (2) good or bad faith of the debtor, (3) injury to the debtor and other creditors if the stay is modified; (4) injury to the movant if the stay is not modified; and (5) the relative proportionality of the harms from modifying or continuing the stay. *See generally, In re JE Livestock, Inc.*, 375 B.R. 892 (10th Cir. BAP 2007) (citing *In re A Partners, LLC*, 344 B.R. 114, 127 (Bankr. E.D. Cal. 2006)); *see also*, *In re Tirey Distributing Co.,* 242 B.R. at 723 (citing *Milne v. Johnson (In re Milne),* 185 B.R. 280 283 (N.D.Ill.1995)).

43.     Here, "cause" exists for the Court to lift the stay to avoid unnecessary costs caused by the delay in completing the Debtor's remaining scope of work on the Projects, which would ultimately impact the estate and increase the liability of all parties.

44.     Pursuant to the terms of the Bonds, in order for Atlantic to discharge its obligations under the Bonds, PSEG is required to make the Contract Balances available to Atlantic for Atlantic to complete, or arrange for completion of, the Debtor's remaining scope of work on the Projects. *See* Bonds, § 2, attached hereto as <u>Exhibits B and D</u>.

45.     In order to find a replacement contractor for the Debtor and to re-let the Contracts to that replacement contractor, it is necessary that the Contracts with the Debtor be terminated.

46.     Pursuant to its rights under the Contracts, PSEG has the right to terminate the Contracts with the Debtor. *See* Contract, General Specifications, CT17-500, § 39, <u>Exhibit A and C</u> hereto.

47.     Although the stay imposed by the Recognition Order does not apply to PSEG Atlantic submits that completing the Debtor's remaining scope of work under the Contracts, allowing PSEG to complete the Debtor's remaining scope of work unnecessarily exposes Atlantic to increased risk under the Bonds and it strips Atlantic's right to mitigate its damages by electing one of its performance options under the Bonds.

48.     Atlantic's increased exposure under the Bonds will likely increase Atlantic's claim against the Debtor's estate. Additionally, the Debtor's inaction will increase the cost to complete the Projects and the losses related to the completion of the work thereunder.

49.     As such, in order to mitigate damages and minimize claims against the Debtor's estate, Atlantic needs the stay lifted so that PSEG may terminate the Contracts, Atlantic can arrange for completion of the Debtor's remaining scope of work under the Contracts for the Projects, and PSEG can make any Contract Balances, if any exist, available to Atlantic for completion of the remaining work pursuant to the terms of the Bonds, Contracts, Indemnity Agreement and applicable law.

50.     The Receiver has made it clear that the Debtor is without the financial capacity to complete its remaining work under the Contracts on the Projects, and that it has no intention to do so.

51.     Given the facts stated herein, and the apparent inequities of the situation, the automatic stay should be lifted for cause to entitle PSEG and Atlantic to the benefit of their bargains under the Contracts, Bonds and Indemnity Agreement pursuant to 11 U.S.C. § 362(d)(1).

**ii.   Section 362(d)(2) Also Permits the Stay to be Lifted.**

52.     "Cause" also exists under Section 362(d)(2). To establish that relief is warranted under Section 362(d)(2), two prongs must be met: (1) the moving party must show that the debtor has no equity in the property; and (2) the moving party must show that the property is not necessary for an effective reorganization. *In re Koopmans*, 22 B.R. 395, 396 (Bankr. D. Utah 1982)

53.     If any Contract Balances exist, they are not property of the estate and so the Debtor has no equity therein. Rather, any Contract Balances that may currently be held (and that may be paid) by PSEG, if any, are trust funds that belong to the Debtor's subcontractors, suppliers and materialmen that performed work on the Projects, *see* Indemnity Agreement, ¶9(b)(vi), attached hereto as <u>Exhibit E</u>, and the remainder of any such Contract Balances belongs to Atlantic for it to fulfill and discharge its obligations under the Bonds, such obligations including, among other things, reimbursement to Atlantic for payment of unpaid subcontractors, suppliers and materialmen and the completion of the Debtor's remaining scope of work on the Contracts for the Projects. *See* Bonds, § 2, attached hereto as <u>Exhibits B and D</u>.

54.      In essence, after paying the trust fund monies to the Debtor's subcontractors, suppliers and materialmen, any Contract Balances, if any exist, represent amounts available under the Contracts for payment of work not-yet-performed. Until the Debtor performs its work under the Contracts, it does not earn and has no rights to those funds. Since the Debtor has not and can no longer earn any Contract Balances, there is no equity belonging to the estate.

55.     Further, as discussed in greater detail below, by virtue of a surety's right to subrogate to the project owner's rights, a surety's interest attaches to contract balances *before* a principal has a right to them, such that the balances never become property of the principal's

14

bankruptcy estate. *E.g., Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135-37 (1962) ("this property interest of the surety never became a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankruptcy…"); *In the Matter of the William P. Bray Co.,* 127 F. Supp. 627, 628 (D. Conn. 1954) (finding surety was subrogated to the obligee' s right to call upon the retained funds for reimbursement and, therefore, the debtor never became entitled to the funds); *In re Modular Struct., Inc.*, 27 F.3d 72, 72 (3d Cir. 1994) (same); *In re Q.C. Piping Install., Inc*., 225 B.R. 553, 573 (Bankr. E.D. N.Y. 1998) (same), or never become the principal's property to which a contractual security interest can attach. *E.g.*, *Federal Ins. Co. v. Comm. State Bank*, 905 F2d. 112 (5th Cir. 1990); *USF&G v. Housing Auth. of Berwick,* 557 F.2d 482 (5th Cir. 1977); *Larbar Corp. v. Liberty Nat'l Bank of Lexington, et al.*, 177 F.3d 439, 444 (6th Cir. 1999). The surety's rights are deemed to relate back to the date of issuance of the bond(s) under which the surety's performance arose. *E.g., Hennignsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404 (1908); *Larbar Corp.*, 177 F.3d at 444.

56.     Indeed, the United States District Court of Connecticut in *William P. Bray Co.*, 127 F. Supp. at 628, (applying Connecticut law), in denying a creditor's petition, held that the bankrupt contractor was never entitled to the funds, and reasoned as follows:

> This is not an interest in or lien upon, property or funds in the possession or control of the bankrupt. Until the obligation to the city was fulfilled the bankrupt had no claim upon the retained funds. The referee held that the city had the right to call upon the retained funds to reimburse itself for any expenditures necessary to complete the fulfillment of the bankrupt's obligation. When the surety expended funds to fulfill the bankrupt's obligations it, the surety, was subrogated to the right of the city to call upon the retained funds for reimbursement. The bankrupt never became entitled to the funds. Note 19 Minn. Law Rev. 454, Surety on Building Contractors Bond; *Prairie State National Bank or Chicago v. U.S.,* 164 U.S. 227, 17 S. Ct. 142, 41 L. Ed. 412, and *see New Amsterdam Casualty Co. v. City of Astoria, D.C.Ore.*,

1919, 256 F. 560; Comment 43 Y.L.J. 1135, Right of Construction
Contractor's Surety to Funds in Owner's Hands.

*William P. Bray Co.,* 127 F. Supp. at 628; *see also*, *Transamerica Ins. Co. v. Barnett Bank of Marion County*, 540 So. 2d 113, 116 (Fla. 1989) ("The overwhelming and essentially unanimous post U.C.C. decisions in this county, federal as well as state courts, have held that (1) the surety's equitable right of subrogation is not a consensual security interest, (2) no U.C.C. filing is necessary to perfect the surety's interest, and (3) the surety's interest continues to be, as it was under pre Code law, superior to the claim of a contract assignee.").

57.     Based on the aforementioned controlling law, and as discussed in greater detail below, Atlantic's subrogation rights entitle Atlantic to a priority right in any Contract Balances, if any exist, and Atlantic's interest attaches to any Contract Balances before the Debtor has a right to them, such that any Contract Balances that may exist never become property of the estate. Thus, the Debtor has no equity in any Contract Balances. And even if the Contract Balances are property of the Estate, Atlantic holds a superior right thereto, ahead of the rights of the Receiver, the Debtor and any secured party claiming a perfected security or other interest in accounts or contract rights.  Finally, if indeed there is any amount of the Contract Balances remaining due after Atlantic completes the Debtor's scope of work under the Contracts, Atlantic has agreed to account to the Receiver and remit any excess to the Receiver.

**B.  Atlantic has a Superior Priority Right in Any Contract Balances That May Exist.**

58.     The longstanding recognized authority cited herein demonstrates and supports that a surety's right to the proceeds of the bonded contract is superior to the Debtor, the Trustee and any other creditor of the Debtor.

59.     Atlantic's rights are based upon (1) state and federal law holding that a surety possesses equitable interest in the proceeds of a bonded contract; (2) United Sates Supreme

16

Court and other Bankruptcy Court precedent holding that a surety's subrogation interest is superior to, and primes, the rights of all other creditors, including the trustee and secured lender; and, (3) various state statutory and case law authority where the projects are located requiring contract funds be held in trust for the benefit and use of the subcontractors and materialmen.

### i. Atlantic's Equitable Right of Subrogation to any Proceeds of the Bonded Contracts Prime the Rights of All Other Creditors

60.     For more than 100 years, the Supreme Court has recognized the priority of a surety's equitable rights, holding that the rights of a subrogated surety prime the rights of the debtor (contractor), its assignees and trustees in bankruptcy. *See e.g. Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962); *Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404 (1908); *Prairie State National Bank v. United States*, 146 U.S. 227 (1896). As such, Atlantic is entitled to adequate protection to preserve its rights in any Contract Balances that may exist. The concept of adequate protection is designed to protect a surety's interests.

61.     A surety's equitable right of subrogation arises by operation of law upon performance by the surety under its payment or performance bond obligations. *Balboa Ins. Co. v. Bank of Bos. Connecticut*, 702 F. Supp. 34, 36 (D. Conn. 1988) ("The doctrine of equitable subrogation is fully applicable where, as here, a party seeks reimbursement for a debt paid under the compulsion of a payment and performance bond.") (*citing Pearlman*, 371 U.S. at 137); *In the Matter of William P. Bray Co.*, 127 F. Supp. 627, 627 (D. Conn. 1954); *Mid-Continent Cas. Co. v. First Nat. Bank & Tr. Co. of Chickasha*, 531 P.2d 1370, 1373 (Okla. 1975) ("When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the (1) contractor insofar as there are receivables due it; (2) in the shoes of laborers and materialmen who have been paid by the Surety; and, (3) not least, in the shoes of the government

for whom the job was completed.") (*citing Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co., Inc.,* 411 F.2d 843, 848 (1st Cir. 1969)); *see e.g., Transamerica Ins. Co. v. Barnett Bank of Marion Cty.*, 540 So. 2d 113 (Fla. 1989). Subrogation is the substitution of one party in place of another with respect to a lawful claim or right so that the substituted party succeeds to the rights of the other.  *In re Alcon Demo., Inc.,* 204 B. R. 440, 446 (Bankr. D. N.J. 1997).  To be sure, "there are few doctrines better established than that a surety who pays the debts of another is entitled to all rights of the person he paid to enforce his right to be reimbursed." *Pearlman,* 371 U.S. at 136-37.

62.     Three U.S. Supreme Court decisions are generally regarded as the predicate of the surety's rights of subrogation. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37 (1962)*; Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404 (1908); *Prairie State Nat'l Bank v. United States,* 164 U.S. 227 (1896).  The U.S. Supreme Court has held a performing surety is subrogated to the rights of three parties: (1) the principal; (2) the subcontractors and suppliers the surety has paid, and; (3) the project owner. *E.g., Pearlman,* 371 U.S. at 136-37; *see also Nat'l Shawmut Bank,* 411 F.2d at 848; *Balboa Ins.,* 702 F. Supp. at 37 ("It is apparent from the foregoing review of the case law that a surety should be given priority over an assignee lender. When a surety performs its obligations under a performance and payment bond, it stands in the shoes of the contractor. Thus, if the contractor has the right to the retained funds, the surety accedes to those rights when it meets its obligations under the bonds."); *William P. Bray Co.*, 127 F. Supp. at 627 ("[w]hen the surety expended funds to fulfill the bankrupt's obligation it, the surety, was subrogated to the right of the city to call upon the retained funds for reimbursement. The bankrupt never became entitled to the funds.") (*citing Prairie State Nat'l Bank*, 164 U.S. 227).

63.     In *Prairie State Nat'l Bank,* the Supreme Court recognized a surety who completes performance is subrogated to claims the obligee may have had to the contract proceeds or retainage. 146 U.S. 227 (1896). In *Henningsen*, the Court recognized a surety who paid subcontractors and material suppliers has the same subrogation rights as a surety who completes performance. 208 U.S. 404 (1908). Importantly, the Court acknowledged the surety's subrogation rights are superior to those of a bank to whom contract proceeds may have been assigned as security for loans. *Id.*

64.     Finally, in *Pearlman,* the U.S. Supreme Court held that the rights of a payment bond surety prime those of a principal's bankruptcy trustee. 371 U.S. 132 (1962). The U.S. Supreme Court held that, because the obligee had a right to pay unpaid subcontractors from contract retainage, and the subcontractors had a right to be paid out of that fund, the surety which paid the subcontractors was entitled to receive the funds to reimburse itself. The U.S. Supreme Court recognized that the surety was subrogated to the rights of the owner as well as to subcontractors and suppliers.  *See also Balboa Ins.,* 702 F. Supp. at 37; *William P. Bray Co.*, 127 F. Supp. at 627; *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 320 (5th Cir. 1967); *In re Alcon Demo. Inc.,* 204 B.R. 440, 447 (Bankr. D. N.J.); *New Mexico State Hwy & Trans. Dept. v. Gulf Ins.*, 996 P.2d 424, 424 (N.M. Ct. of App. 1999).  The U.S. Supreme Court explained:

> We therefore hold in accord with the established legal principles stated above that the government had a right to use the retained funds to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the funds; that the contractor had he completed his job and paid his laborers and materialmen would have been entitled to the fund, and that the surety having paid the laborers and materialmen is entitled to the benefit of all these rights to the extent necessary to reimburse it.

*Pearlman,* 371 U.S. at 135-36.

65.    The principle that a surety can step into the shoes of three different parties is what often causes confusion among other creditors.  Indeed, one court has noted:

> [L]ogic compels the surety to be assessed as merely one of the contractor's creditors, and to be subject to the system of priorities rationalized by the Uniform Commercial Code.  But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes.  When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of the laborers and material men who have been paid by the surety --who may have had liens; and not least, in the shoes of the government, for whom the job was completed.

*Nat'l Shawmut Bank,* 411 F.2d at 845 (citing *Pearlman*, 371 U.S. at 140 n. 19).

66.    *Pearlman* and its progeny was followed and relied upon by United States District Court of Connecticut in *Balboa Ins. Co. v. Bank of Boston Connecticut*, 702 F. Supp. 34 (D. Conn. 1988) (applying Connecticut law) wherein the performing surety sought declaratory judgment as to priorities between itself and the assignee lender as to the bonded project funds. On the surety's motion for summary judgment, the court found, in part, that (1) the doctrine of equitable subrogation survived Connecticut's enactment of Article 9 of the Uniform Commercial Code; and (2) under doctrine of equitable subrogation the surety has a priority right to the funds over the assignee lender. In making its findings, the court reasoned, in relevant part, as follows:

> The question of which competing interest has priority is a novel one in this state. The Court is not without guidance, however, as several others courts have had the opportunity to pass upon this issue.
>
> In *In re J.V. Gleason Co., Inc.,* 425 F.2d 1219 (8th Cir.1971), the Eighth Circuit considered the conflicting priority of a bankruptcy trustee as a lien creditor and a surety. In holding that the surety had priority, the court noted that the surety's rights to the retained funds matured when it paid off the debt owed by the owner to the materialmen and laborers. *Id.* at 1225. Therefore, despite the fact that the trustee had a statutory lien on the funds, the court found that the trustee had no right to distribute the funds because the

20

surety's right was primary, thus defeating the trustee's right of ownership. *Id. See also Riverview State Bank v. Wentz*, 34 F.2d 419 (8th Cir.1929) (held surety had priority over lender in view of fact that bank was under no compulsion to lend the funds, and surety bond was statutory requirement).

More recent cases also support the proposition that a surety has priority over an assignee lender. In *Kimberly–Clark Corp. v. Alpha Bldg. Co.,* 591 F. Supp. 198 (N.D.Miss.1984), the court considered the competing claims of a surety and an assignee bank. Although the contractor assigned the bank the right to all future payments under the contract as consideration for a loan, and the bank perfected its security interest through the proper filing procedures, the court held that the surety had priority over the bank to the contract funds. *Id.* at 209. The court found that despite the bank's claim that it relied upon the proceeds of the contract as collateral to secure its loan, the surety was placed in the position of a principal obligor, thus entitling it to reimbursement. *Id.* at 207–8. *See also First Alabama Bank of Birmingham v. Hartford Acc. and Indem., Inc.,* 430 F. Supp. 907 (N.D.Ala.1977) (surety given priority despite the fact the assignee lender's rights vested simultaneously with surety's rights); *First Vermont Bank & Trust Co. v. Village of Poultney,* 134 Vt. 28, 349 A.2d 722, 726 (1975) (notice to the lender of the surety's interest was significant to holding surety had priority).

It is apparent from the foregoing review of the case law that a surety should be given priority over an assignee lender. When a surety performs its obligations under a performance and payment bond, it stands in the shoes of the contractor. Thus, if the contractor has the right to the retained funds, the surety accedes to those rights when it meets its obligations under the bonds. *See, e.g., Trinity Universal Ins. Co. v. United States,* 382 F.2d 317, 320 (5th Cir.1967), *cert. denied,* 390 U.S. 906, 88 S. Ct. 820, 19 L.Ed.2d 873 (1968); *Corbin,* § 901…The Court therefore holds that, by virtue of the doctrine of equitable subrogation, the surety has priority to the retained funds.

*Balboa Ins.*, 702 F. Supp. at 37–38.

67. Similarly, in *In the Matter of the William P. Bray Co.,* 127 F. Supp. 627 (D. Conn. 1954), a creditor petitioned the award of the contract balance held by the obligee to the surety. The court ultimately held that where a surety on completion and payment bonds of bankrupt

contractor paid out more than balance of the retained funds in carrying out the contractor's obligation under the construction contract with the obligee, the surety was subrogated to the obligee's rights to the funds for reimbursement and the bankrupt contractor never became entitled to the funds, therefore, the surety's rights to the funds were superior to those of the bankrupt contractor's creditor and trustee. *William P. Bray Co.,* 127 F. Supp. at 627.

68.     Many other courts have applied the holding in *Pearlman* in cases decided under the Code. *E.g., In re Modular Struc.*, 27 F.3d 72 (3d Cir. 1994); *In re Fegert*, 88 B.R. 258, 260 (9th Cir. Bankr.1988), *aff'd*, 887 F.2d 955 (9th Cir.1989); *In re Q.C Piping Install., Inc.*, 225 B.R. 553,564 (Bankr. E.D. N.Y. 1998); *In re Pacific Marine Dredging,* 79 B.R. 924, 928 (Bankr. D. Or. 1987); *Board of Trustees of the Univ. of Illinois v. USF&G*, 1991 WL 127589 (N.D. Ill. July 13, 1991) (recognizing equitable lien created prior to bankruptcy case is superior to right of trustee).

69.     Accordingly, Atlantic not only has an interest in any Contract Balances on the Bonded Projects, its interest primes all the rights the Receiver, the Debtor and all other creditors.

### ii.   Atlantic's Rights Are Not Governed by Article 9 of the Uniform Commercial Code

70.     It has long been settled that a surety's rights are not governed by the UCC and UCC filings are not required to perfect those rights. Since a surety's subrogation rights are equitable in nature and arise as a matter of law, a surety is not required to "perfect" its subrogation interest under the UCC.  *See e.g., Balboa Ins.*, 702 F. Supp. at 36-37; *William P. Bray Co.,* 127 F. Supp. at 627; *Amwest Surety Ins. Co. v. United States*, 870 F. Supp. 432, 434 (D. Conn. 1994); *In re Comcraft, Inc.* 206 B.R. 551 (Bankr. D. Or. 1997); *In re Larbar Corp.*, 177

F.3d 439 (6th Cir. 1999); *Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co.,* 411 F.2d

843, 848 (1st Cir. 1969); *In re Alcon Demo., Inc.,* 204 B.R. 440, 447 (Bankr. D. N.J. 1997).

71.     Indeed, in *Balboa,* (applying Connecticut law), the court reasoned, in relevant part,

as follows:

> The purpose of Article 9 of the Uniform Commercial Code is to regulate all consensual security agreements covered by the Code. Conn.Gen.Stat. § 42a–9–102. The Article is not exclusive in coverage, however. Its application is limited to transactions entered into at the consent of the parties and memorialized in a contract. Conn.Gen.Stat. § 42a–9–102(2). An equitable lien is not a covered transaction because it arises not by consent, but by operation of law. *In re J.V. Gleason Co., Inc.,* 452 F.2d 1219, 1222 (8th Cir.1971). Furthermore, the drafters of the Code rejected the inclusion of a provision regulating the obligation to reimburse a surety. The drafters noted that the inclusion of such a section would unnecessarily restrict the surety's ability to bargain with a lender over the subordination of the surety's claim. Recommendation of the Editorial Board for Changes in the Text and Comments of the Uniform Commercial Code, U.C.C. § 9–312, at 24–5 (Proposed Official Draft, Text and Comments Edition, 1953). Accordingly, the Code makes no reference to the position of the surety, and in light of the Code's application of general principles of law and equity to non-Code covered transactions, it is evident that the doctrine of equitable subrogation survives the Code's enactment.

*Balboa Ins.*, 702 F. Supp. at 36–37; see also, *Amwest Surety Ins*, 870 F. Supp. at 434 (finding

under Connecticut law surety is not required to file financing statement to protect surety's

interest in proceeds of principal's contract).

72.     Atlantic has paid, and will likely be required to pay, numerous vendors of the

Debtor in order to discharge its obligations under the Bonds.  Thus, Atlantic possesses interest in

any Contract Balances which may exist which is superior to a secured lender or trustee by

operation of law, which are unaffected by the provisions of Article 9 of the UCC.

### C. Request to Waive 14-Day Period Pursuant to Bankr. Rule 4001(a)(3)

73.     Atlantic requests that the 14-day holding period under Bankr. Rule 4001(a)(3) is waived.

74.     As outlined in more detail above, delay in obtaining the relief from stay as requested will cause unnecessary and irreparable harm to Atlantic, PSEG, the Project owner, the public and the Debtor in the form of additional costs, further Project delays and reserve shortage conditions potentially leading to loss of load (blackout) in the New England area.

### D. Conclusion

For the foregoing reasons, Atlantic Specialty Insurance Company requests that the Court lift the automatic stay and grant the following relief:

   a. The stay is lifted for cause under 28 U.S.C. §§ 362(d)(1) and 362(d)(2) to allow PSEG and Atlantic to exercise all their rights under the terms of the Contracts, the Bonds, the Indemnity Agreement and applicable law, so that among other things (1) PSEG may terminate the Contracts; (2) Atlantic may complete the Debtor's remaining scope of work under the Contracts pursuant to its rights and obligations under the Bonds, Contracts, Indemnity Agreement and applicable law; (3) Atlantic may utilize any existing Contract Balances to complete the Debtor's remaining scope of work under the Contracts pursuant to its rights and obligations under the Bonds, Contracts, Indemnity Agreement and applicable law; (4) Atlantic and/or PSEG may contract with the Debtor's subcontractors and/or suppliers to engage them to complete the Projects; and (5) PSEG may pay Atlantic the Contract Balances pursuant to its rights and obligations under the Bonds, Contracts, Indemnity Agreement and applicable law;

b.  Atlantic is entitled to pursue affirmative claims and assert all of the Debtor's rights in and under the Bonded Contracts. PSEG is equally entitled to assert any defenses to any said claims and to assert any pending or future back charges and any pending or future claims and rights under the Contracts, including, but not limited to, PSEG's LD Claims;

c.  After discharging its obligations under the Bonds for the Projects and upon release of Atlantic's Bonds, upon request by the Receiver, Atlantic shall provide an accounting as to the payments it made and any Contract Balances received by Atlantic;

d.  This Order terminating and annulling the stay is immediately effective and the 14-day holding period under Rule 4001(a)(3) is waived;

e.  PSEG, Atlantic and the Debtor retain any rights they may have to assert claims against each other for any losses sustained pursuant to the terms of the Bonds, Contracts, Indemnity Agreement and applicable law; and

f.  Together with such additional relief that this Court deems adequate and just.

### NOTICE OF OPPORTUNITY FOR HEARING

**Your rights may be affected. You should read this document carefully and consult your attorney about your rights and the effect of this document.** If you do not want the Court to grant the requested relief, or you wish to have your views considered, you must file a written response or objection to the requested relief with the Clerk of the United States Bankruptcy Court for the Northern District of Oklahoma, 224 South Boulder, Tulsa, Oklahoma 74103 no later than 14 days from the date of filing of this request for relief. You should also serve a file-stamped copy of your response or objection to the undersigned movant/movant's attorney [and others who are required to be served] and file a certificate of service with the Court. If no response or objection is timely filed, the Court may grant the requested relief without a hearing or further notice. **The 14 day period includes the three (3) days allowed for mailing provided for in Fed. R. Bankr. P. 9006(f).**

/s/ Andrew R. Turner
Andrew R. Turner, OBA #9125
CONNER & WINTERS, LLP
4000 One Williams Center
Tulsa, Oklahoma 74172-0148
(918) 586-8972, fax (918) 586-8672
aturner@cwlaw.com

Attorneys for Movant
ATLANTIC SPECIALTY INSURANCE
COMPANY

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 30, 2019, a copy of the foregoing instrument was served by CM/ECF upon the following:

John E. Howland
Steven A. Pierce
Attorneys for the Receiver

Chad J. Kutmas
Attorney for CB&I North Carolina, Inc.

Lyle R. Nelson
Attorney for Tenn. Gas PL, Sierrita Gas PL & El Paso Natural Gas Co.

Kyle L. Dickson
Attorney for GP East LLC

Christopher B. Woods
Attorney for Samuel, Son & Co. (USA) Inc.

Duane Brescia
Attorney for Epicor Software Corp.

Alexander Sokolosky
Attorney for Crowe & Dunlevy

Marvin E. Sprouse III
Attorney for Industrias Metalicas de Monclova SA de CV

Brian A. Kilmer
Attorney for Shoffnerkalthoff MES, Inc.

and upon such other entities as were listed in the CM/ECF system at the time of filing, which includes all parties having filed an Entry of Appearance/Request for Notices in the case through the date hereof.

In addition, I certify that on April 30, 2019, a filed copy of the foregoing instrument was mailed by regular mail, postage prepaid, to:

Alberta Treasury Branch
W. Twr, 8th Ave Pl, #600
585 8th Ave SW
Calgary, Alberta, Canada T20 1G1

In addition, I certify that on April 30, 2019, I sent a filed copy of the foregoing instrument by email to:

Walker W. MacLeod
McCarthy Tetrault LLP
wmacleod@mccarthy.ca
Attorney for ATB Financial

Jeremy Ryan
Potter Anderson Corroon LLP
jryan@potteranderson.com
Attorney for ATB Financial

R. Stephen McNeill
Potter Anderson Corroon LLP
rmcneill@potteranderson.com
Attorney for ATB Financial

Suzanne M. Klar
Associate General Commercial Counsel
PSEG Services Corporation
Suzanne.klar@pseg.com
Attorney for PSEG Services Corporation

/s/ Andrew R. Turner

27