## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN RE:

**Innova Global Ltd.,** *et al.*[1]

**Debtor.**

**Case No. 19-10653-R**
**(Chapter 15)**

## JOINT MOTION OF ATLANTIC SPECIALTY INSURANCE COMPANY AND KIEWIT POWER CONSTRUCTORS CO. FOR RELIEF FROM AUTOMATIC STAY TO ALLOW FOR TERMINATION OF CONTRACT AND USE OF BONDED CONTRACT FUNDS, REQUEST FOR WAIVER OF STAY OF ORDER PURSUANT TO B.R. 4001(A)(3) AND NOTICE OF OPPORTUNITY FOR HEARING

Pursuant to 11 U.S.C. §§ 1520(a)(1), 362(d), B.R.  4001(a)(1) and (3), and Local Rules 4001-1 and 9013-1, Movants Atlantic Specialty Insurance Company ("Atlantic") and Kiewit Power Constructors Co. ("Kiewit" and, together with Atlantic, the "Movants"), file this Motion for Relief from the Automatic Stay (the "Motion") and respectfully request that the Court enter an order:

> (1) modifying the automatic stay to permit Kiewit to issue any required notice or notices of default and to take such additional action or actions as may be necessary to terminate the Subcontracts, as defined *infra*, between itself and Innova Global, Inc., one of the debtors in these cases ("Debtor" or "Innova"), or to take such other actions with respect thereto as may be necessary and appropriate to invoke and facilitate the exercise of Kiewit's rights under the Bonds, as defined *infra*;
>
> (2) modifying the automatic stay to permit Atlantic to complete the Debtor's remaining scope of work under the Subcontracts pursuant to Atlantic's rights and obligations under the Subcontracts, Bonds, as defined *infra*, Indemnity Agreement, as defined *infra*, and law;

---

[1] The Debtors are: (1) Innova Global Ltd., (2) Innova Global Operating Ltd., (3) Innova Global Limited Partnership, (4) 1938247 Alberta Ltd., (5) Innova Global Holdings Limited Partnership, (6) Innova Global Inc. (formerly AEM Emissions Management Inc., formerly ATCO Emissions Management Inc.), (7) Innova Global LLC (formerly AEM Noise Management LLC, formerly ATCO Noise Management LLC), and (8) Braden Manufacturing, LLC.

(3) modifying the automatic stay to permit Atlantic to utilize the Subcontract Balances, as defined *infra*, to complete the Debtor's remaining scope of work under the Subcontracts pursuant to Atlantic's rights and obligations under the Bonds, Subcontracts, Indemnity Agreement and law;

(4) modifying the automatic stay to permit Atlantic and/or Kiewit to contract directly with the Debtor's existing subcontractors and/or suppliers to engage the latter to complete the Projects, as defined *infra*;

(5) modifying the automatic stay to permit Kiewit to pay Atlantic the Subcontract Balances pursuant to the Movants' respective rights and obligations under the Bonds, Subcontracts and law; and

(6) ordering that there be no 14-day stay of this Court's order modifying the automatic stay.

In support of this Motion, the Movants state as follows:

<u>**PARTIES**</u>

1.    Atlantic is a New York corporation with its principal place of business in Plymouth, Minnesota. At all relevant times hereto, Atlantic was a surety company engaged in the business of issuing surety bonds on behalf of contractors engaged in the business of construction for construction projects throughout the United States.

2.    Kiewit is a Delaware corporation with its principal place of business in Omaha, Nebraska.

3.    On April 1, 2019, the Debtor and certain of its affiliates were placed into a receivership proceeding in the Court of Queen's Bench of Alberta in the Judicial Centre of Calgary Canada, Court File No. 1901-04589 ("Canadian Proceedings") under section 243(1) of the Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, and section 13(2) of the Judicature Act, R.S.A. 2000, c. J-2. PricewaterhouseCoopers Inc., LIT ("PWC") was appointed as the Receiver ("Receiver") in the Canadian Proceedings.

4.      On April 4, 2019, in this Court, the Receiver filed a Chapter 15 Petition for Recognition of a Foreign Proceeding, thereby commencing this case.

## JURISDICTION

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.

6.      This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

7.      This Motion is filed under 11 U.S.C. §§ 362, 1519(a), and 1520, B.R. 4001(d), and Local Bankruptcy Rule 4001-1, 9013-1.

## BACKGROUND FACTS

8.      At all relevant times hereto, the Debtor was in the business of, among other things, designing, supplying and installing certain pre-engineered buildings on construction projects throughout the United States.

9.      On or about November 19, 2015, Kiewit, as general contractor, and AES Huntington Beach Energy, LLC, as owner, entered into a contract for the construction of the project commonly known as AES Southland Repowering, CCGT at Huntington Beach ("Huntington Beach Project") located near Huntington Beach, California.

10.     On or about June 30, 2017, Debtor, as subcontractor, and Kiewit, as general contractor, entered into a subcontract ("Huntington Subcontract") for Debtor to perform certain construction services for the Huntington Project. A true and correct copy of the Huntington Subcontract is attached hereto as Exhibit A.

11.     At the request of Debtor, Atlantic, as surety, issued payment and performance bond no. 800017140 / 917105328 for the benefit of Kiewit, as obligee, guaranteeing Debtor's payment and performance obligations of the Huntington Subcontract for the Huntington Project in the penal sum amount of Three Million Nine Hundred Ninety-Three Thousand Nine Hundred Sixty-Seven

and 00/100 Dollars ($3,993,967.00) ("Huntington Bond"). A true and correct copy of the Huntington Bond is attached hereto as <u>Exhibit B</u>.

12.     On or about March 19, 2016, Kiewit, as general contractor, and AES Alamitos Energy, LLC, as owner, entered into a contract for the construction of the project commonly known as AES Southland Repowering, CCGT at Alamitos ("Alamitos Project") located near Long Beach, California.

13.     On or about June 30, 2017, Debtor and Kiewit entered into a subcontract ("Alamitos Subcontract") for Debtor to perform certain construction services for the Alamitos Project. A true and correct copy of the Alamitos Subcontract is attached hereto as <u>Exhibit C</u>.

14.     At the request of Debtor, Atlantic, as surety, issued payment and performance bond no. 800017141 / 917105329 for the benefit of Kiewit, as obligee, guaranteeing Debtor's payment and performance obligations of the Alamitos Subcontract for the Alamitos Project in the penal sum amount of Four Million Four Hundred Sixty-Three Thousand Four Hundred Twenty-Five and 00/100 Dollars ($4,463,425.00) ("Alamitos Bond"). A true and correct copy of the Alamitos Bond is attached hereto as <u>Exhibit D</u>.

15.     The Huntington Subcontract and Alamitos Subcontract shall collectively be referred to herein as the "Subcontracts." The Huntington Project and the Alamitos Project shall collectively be referred to herein as the "Projects." The Huntington Bond and the Alamitos Bond shall collectively be referred to herein as the "Bonds."

16.     As a condition precedent to issuing the Bonds on behalf of Debtor, on or about April 8, 2016, the Debtor, among others, executed a General Application and Indemnity Agreement in favor of Atlantic ("Indemnity Agreement"). A true and correct copy of the Indemnity Agreement is attached hereto as <u>Exhibit E</u>.

4

17.     Kiewit has made a claim against the Bonds, notifying Atlantic that Debtor is in default of the Subcontracts and demanding, among other things, that Atlantic perform Debtor's remaining work under the Subcontracts pursuant to the terms of the Bonds.

18.     The Bonds provide, in relevant part:

> Without limitations of the foregoing, in the event that the Contractor exercises its right to terminate for default or take over the work of Principal, the Surety will upon notice take immediate action to fulfill its obligations under the bond and indemnify and reimburse Contractor for costs and damages incurred.

*See* Bonds, attached hereto as <u>Exhibits B and D</u>.

19.     Similarly, the Indemnity Agreement provides that "in the event of the…breach of any Bonded Contracts or the breach of any Bonds…" Atlantic is entitled "to complete the Bonded Contracts or cause the same to be completed…" *See* Indemnity Agreement, ¶ 8(c), attached hereto as <u>Exhibit E</u>.

20.     On April 4, 2019 ("Petition Date"), PWC filed with this Court a petition ("Petition") pursuant to Sections 1515 and 1517 of the Bankruptcy Code for entry of an order recognizing the Canadian Proceedings as foreign main proceedings pursuant to Section 1517 of the Bankruptcy Code.

21.     On or about April 18, 2019, the Court entered its Order Granting the Petition for Recognition as Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the United States Bankruptcy Code and Related Relief (docket #54) ("Recognition Order"), granting Receiver all relief afforded under 11 U.S.C. § 1520, including imposition of the automatic stay provided for in Section 362(a) of the Bankruptcy Code. It is the stay imposed by the Recognition Order and by 11 U.S.C. §§ 362(a), 1520 from which relief is sought by this Motion.

22.     By the express terms of the Recognition Order, the stay imposed thereby applies to Kiewit's and Atlantic's ability to complete the Debtor's remaining scope of work under the

Subcontracts, Atlantic's ability to utilize the Subcontract Balances to complete the Debtor's remaining scope of work under the Subcontracts, and Kiewit's ability to terminate the Subcontracts under the terms thereof and pay Atlantic the Subcontract Balances in accordance with the terms of the Subcontracts, Bonds, Indemnity Agreement and law.

23.     Payment of the Subcontract Balances from Kiewit to Atlantic is necessary to trigger Atlantic's obligations under the Bonds and to permit Atlantic to utilize such Balances to complete Debtor's remaining scope of work under the Subcontracts on the Projects.

24.     Termination of the Subcontracts and allowing Atlantic to complete the Debtor's remaining scope of work under the Subcontracts is necessary in order for Kiewit and Atlantic to mitigate their damages and reduce and/or minimize their resultant claims against the Debtor.

25.     Section 7 of the Subcontracts allow for Kiewit to terminate the Subcontracts, and state as follows:

> (a) In the event Subcontractor fails to comply or becomes disabled from complying with the provisions herein as to character or time of performance, including but not limited to payment for all materials furnished and Work and labor performed under this Agreement, and the failure is not corrected within five (5) calendar days after written request by Contractor to Subcontractor, Contractor, by agreement or otherwise, may without prejudice to any other right or remedy, terminate this Agreement for default and take over and complete the performance of this Agreement at the expense of Subcontractor, or without terminating the Agreement, take over the Work or any portion thereof and furnish such materials and/or employ such workers as may be necessary to remedy the situation at the expense of Subcontractor.  If Contractor takes over the Work or terminates the Agreement pursuant to this paragraph, it is specifically agreed that Contractor may, in addition to any other rights it may have, take possession of the premises and of all materials, tools and equipment of Subcontractor at the Project Site for the purpose of completing the Work covered by this Agreement.  If for any reason the termination, in whole or part, of Subcontractor shall be determined by an arbitrator or court of competent jurisdiction to have been wrongful or unjustified, then, such termination shall be deemed and considered a termination pursuant to Section 7(c).

(b) It is recognized that if Subcontractor becomes insolvent, or institutes or has instituted against it bankruptcy proceedings, or makes a general assignment for the benefit of creditors, or if a receiver is appointed for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, such event or events could impair or frustrate Subcontractor's performance of this Agreement. Accordingly, it is agreed that upon the occurrence of any such event, Contractor shall be entitled to request of Subcontractor or its receiver or court-appointed successor adequate assurances of future performance. Pending receipt of adequate assurances of performance and actual performance in accordance therewith, Contractor shall be entitled to take over the Work pursuant to the provisions of Subsection 7(a) above without notice to Subcontractor.

*See* Subcontracts, attached hereto as Exhibits A and C, § 7.

26.     Atlantic, too, has the right to seek termination of the Subcontracts, pursuant to its equitable subrogation rights, so as to enable Atlantic to relet the Subcontracts and facilitate the completion of the Projects.

27.     The Debtor and Receiver both lack the financial wherewithal to perform under the Subcontracts on the Projects. Atlantic and Kiewit have been advised by the Receiver and one of his United States attorneys that the Debtor has ceased doing business and has no intention to complete its work under the Subcontracts on the Projects further entitling Kiewit to terminate the Subcontracts pursuant to Section 7 of the Subcontracts. *See* Subcontracts, § 7, Exhibits A and C hereto.

28.     Atlantic has been informed, and upon such information believes and avers that the Projects are at a critical junction wherein the failure and/or ability of the Debtor to continue performance will substantially impede, hinder, delay and obstruct the progress and/or timely completion of the Projects.

29.     The Subcontracts provide that if the Projects are not timely completed by Debtor, liquidated damages will be assessed. For instance, if the Debtor fails to meet the agreed upon

delivery dated for the engineering deliverables in the Technical Specification Subcontractor's Deliverables Schedule it is liable for liquidated damages in the amount of $500 per day per drawing, document or package that is delayed. Similarly, if the Debtor fails to meet the agreed upon completion dates for certain construction milestones on the Projects the Debtor is liable for liquidated damages in the amount $10,000 per day. And finally, if the Debtor fails to meet the Guaranteed Substantial Completion Date for the Projects it is liable in the amount of $20,000 per day. *See* Subcontracts, attached hereto as <u>Exhibits A</u> and <u>C</u>, Special Conditions, ¶ SC.3(A) – (C).

30.     If work to complete the Subcontracts is not re-commenced forthwith, the time required to complete the remaining work will cause completion to occur beyond the deadline dates and, thereby, cause Atlantic to be liable for liquidated damages under the terms of the Bonds.

31.     Atlantic estimates that the anticipated cost of completing the Debtor's remaining scope of work under the Subcontracts and the cost to pay Debtor's subcontractors, suppliers, and materialmen will exceed the amount of Subcontract Balances held by Kiewit for the completion of the Projects.

32.     Given that the anticipated cost of completing the Debtor's remaining scope of work under the Subcontracts and the cost to pay Debtor's subcontractors, suppliers, and materialmen will exceed the amount of Subcontract Balances held by Kiewit, and that to the extent that Atlantic expends funds under the Bonds, Atlantic has first priority to the Subcontract Balances in possession of Kiewit, ahead of the Receiver or any secured creditor claiming a security interest or other interest in Debtor's accounts and Subcontract rights.

33.     As such, Atlantic and Kiewit are seeking relief from the stay imposed by the Recognition Order and 11 U.S.C. §§ 362(a), 1520 to allow Kiewit and Atlantic to exercise all their rights under the terms of the Subcontracts, the Bonds, the Indemnity Agreement and applicable

non-bankruptcy law, so that among other things: (1) Kiewit may terminate the Subcontracts; (2) Atlantic may complete the Debtor's remaining scope of work under the Subcontracts pursuant to its rights and obligations under the Bonds, Subcontracts, Indemnity Agreement and law; (3) Atlantic may utilize the Subcontract Balances to complete the Debtor's remaining scope of work under the Subcontracts pursuant to its rights and obligations under the Bonds, Subcontracts, Indemnity Agreement and law; (4) Atlantic and/or Kiewit may contract with the Debtor's subcontractors and/or suppliers to engage them to complete the Projects; and (5) Kiewit may pay Atlantic the Subcontract Balances pursuant to its rights and obligations under the Bonds, Subcontracts and law.

34.     Atlantic has already agreed with the Receiver that, should relief be granted as requested herein, Atlantic will provide the Receiver with an accounting of its receipts and expenditures of the Subcontract Balances, and in the event the costs incurred by Atlantic to complete the Debtor's remaining scope of work under the Subcontract does not exceed the Subcontract Balances, to remit any excess to the Receiver.

35.     This Motion is supported by the Declarations of Terrence Dahl and Daniel Rocole, attached hereto as Exhibits F & G, respectively.

## LEGAL ANALYSIS

### A.  Relief from the Stay is Warranted.

36.     Relief from the automatic stay may be granted either "for cause" or, with respect to a stay of an act against property, when "the debtor does not have an equity in such property" and "such property is  not necessary to an effective reorganization."  11 U.S.C. § 362(d)(1), (2).

### i. "Cause" Exists to Lift the Stay Under Section 362(d)(1) of the Bankruptcy Code.

37.     Section 362(d)(1) permits lifting the automatic stay "for cause." 11 U.S.C. § 362(d)(1). "Cause" has not been fully defined by the Bankruptcy Code, therefore, "relief from stay for cause is a discretionary determination made on a case by case basis." *In re Busch,* 294 B.R. 137, 140 (10th Cir. BAP 2003) (citing *Pursifull v. Eakin,* 814 F.2d 1501, 1506 (10th Cir.1987)).

38.     Among the factors to consider in determining whether the automatic stay should be modified for cause include: (1) an interference with the bankruptcy; (2) good or bad faith of the debtor, (3) injury to the debtor and other creditors if the stay is modified; (4) injury to the movant if the stay is not modified; and (5) the relative proportionality of the harms from modifying or continuing the stay. *See generally, In re JE Livestock, Inc.*, 375 B.R. 892 (10th Cir. BAP 2007) (citing *In re A Partners, LLC*, 344 B.R. 114, 127 (Bankr. E.D. Cal. 2006)); *see also*, *In re Tirey Distributing Co.,* 242 B.R. at 723 (citing *Milne v. Johnson (In re Milne),* 185 B.R. 280 283 (N.D.Ill.1995)).

39.     Here, "cause" exists for the Court to lift the stay to avoid unnecessary costs caused by the delay in completing the Debtor's remaining scope of work on the Projects, which would ultimately impact the estate and increase the liability of all parties.

40.     Pursuant to the terms of the Bonds, in order to trigger Atlantic's bonded obligations, Kiewit is first required to terminate the Subcontracts. Upon termination, Atlantic is then required to "take immediate action to fulfill its obligations under the bond" by completing, or arranging for the completion of, the Debtor's remaining scope of work on the Projects. *See* Bonds, attached hereto as <u>Exhibits B</u> and <u>D</u>.

41.     In order to trigger Atlantic's Bonded obligations and in order to find a replacement contractor for the Debtor and to relet the Subcontracts to that replacement contractor, it is necessary that the Subcontracts with the Debtor be terminated.

42.     Pursuant to its rights under the Subcontracts, Kiewit has the right to terminate the Subcontracts with the Debtor. *See* Subcontracts, § 7, Exhibits A and C hereto.

43.     Atlantic is entitled to use the remaining Subcontract Balances to complete, or arrange for completion of, the Debtor's remaining scope of work on the Projects, and pay the Debtor's vendors.

44.     If Kiewit and Atlantic are not granted relief from the stay to terminate the Subcontracts, complete the Debtor's remaining scopes of work on the Projects and use the Subcontract Balances to complete the Debtor's work and pay its vendors, Kiewit and Atlantic would be stripped of their bargained-for rights under the Bonds, Subcontracts, and Indemnity Agreement.

45.     Further, the damages associated with the Debtor's default, i.e., liquidated damages, will not only increase the costs for completion but it will also increase the claims Kiewit and Atlantic have against the Debtor's estate.

46.     As such, in order to mitigate damages and minimize claims against the Debtor's estate, the automatic stay should be lifted so that Kiewit may terminate the Subcontracts, Atlantic can arrange for completion of the Debtor's remaining scope of work under the Subcontracts for the Projects, Atlantic and/or Kiewit can contract with the Debtor's subcontractors and/or suppliers to engage them to complete the Projects, and Kiewit can make the Subcontract Balances available to Atlantic for completion of such remaining work pursuant to the terms of the Bonds, Subcontracts, Indemnity Agreement and law.

47.     The Receiver has made it clear to Kiewit and Atlantic that the Debtor is without the financial capacity to complete its remaining work under the Subcontracts on the Projects, and that it has no intention to do so.

48.     Given the facts stated herein, and the apparent inequities of the situation, the automatic stay should be lifted for cause to entitle Kiewit and Atlantic to the benefit of their bargains under the Subcontracts, Bonds and Indemnity Agreement pursuant to the applicable subsections of 11 U.S.C. § 362.

### ii.   Section 362(d)(2) Also Permits the Stay to be Lifted.

49.     "Cause" also exists under Section 362(d)(2) of the Bankruptcy Code. To establish that relief is warranted under Section 362(d)(2), two prongs of a two-part test must be met: (1) the moving party must show that the debtor has no equity in the property; and (2) the moving party must show that the property is not necessary for an effective reorganization. *In re Koopmans*, 22 B.R. 395, 396 (Bankr. D. Utah 1982)

50.     The Subcontract Balances are not property of the estate and so the Debtor has no equity therein. Rather, the Subcontract Balances currently held (and that may be paid) by Kiewit are trust funds that belong to the Debtor's subcontractors, suppliers and materialmen that performed work on the Projects, *see* Indemnity Agreement, ¶9(b)(vi), attached hereto as Exhibit E, N.Y. Lien Law §§ 70-79-a, and the remainder of the Subcontract Balances belong to Atlantic so that it can to fulfill and discharge its obligations under the Bonds, such obligations including, among other things, reimbursement to Atlantic for payment of unpaid subcontractors, suppliers and materialmen and the completion of the Debtor's remaining scope of work on the Subcontract for the Projects. *See* Bonds, attached hereto as Exhibits B and D.

51.     In essence, after paying the trust fund monies to the Debtor's subcontractors, suppliers and materialmen, the Subcontract Balances represent amounts available under the Subcontract for payment of work not-yet-performed. Until the Debtor performs its work under the Subcontract, it does not earn and has no rights to those funds. Since the Debtor has not earned and can no longer earn the Subcontract Balances, there is no equity belonging to the estate.

52.     Further, as discussed in greater detail below, by virtue of a surety's right to subrogate to the project owner's rights, a surety's interest attaches to contract balances *before* a principal has a right to them, such that the balances never become property of the principal's bankruptcy estate, *e.g., Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135-37 (1962) ("this property interest of the surety never became a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankruptcy…"); *In re Q.C. Piping Install., Inc*., 225 B.R. 553, 573 (Bankr. E.D. N.Y. 1998) (finding that debtor who, prior to commencement of its bankruptcy case, had defaulted in its obligations under the construction contract requiring its surety to pay the debtors' vendors and complete the debtor's remaining work, had no interest in any monies retained by the owner and that such monies did not become property of the debtor's bankruptcy estate); *In re Modular Struct., Inc.*, 27 F.3d 72, 72 (3d Cir. 1994) (same), or never become the principal's property to which a contractual security interest can attach. *E.g.*, *Federal Ins. Co. v. Comm. State Bank*, 905 F2d. 112 (5th Cir. 1990); *USF&G v. Housing Auth. of Berwick*, 557 F.2d 482 (5th Cir. 1977); *Larbar Corp. v. Liberty Nat'l Bank of Lexington, et al.*, 177 F.3d 439, 444 (6th Cir. 1999).

53.     The surety's rights are deemed to relate back to the date of issuance of the bond(s) under which the surety's performance arose. *United States Fid. & Guar. Co. v. Triborough Bridge Auth.*, 297 N.Y. 31, 36 (1947) (*"*To all rights under this contract the bonding company was

subrogated. The equity in favor of the surety company arose at the time of the giving of its bond. The right became available when the surety company completed the work at a loss…"); *Henningsen v. United States Fidelity and Guaranty Co.*, 208 U.S. 404 (1908); *Larbar Corp.*, 177 F.3d at 444.

*54.*    Indeed, in *QC Piping Installations, Inc.*, 225 B.R, 553, 564-65 (Bankr. E.D. N.Y. 1998), the court considered the issue of whether retainage earned by the debtor prior to its bankruptcy filing was part of the debtor's bankruptcy estate. In finding that the retainage was not part of the debtor's bankruptcy estate, the court cited and analyzed numerous New York cases finding that "the contractors in construction cases have no property interest in contract retainage when a surety has stepped in upon the contractor's default," (*citing Triborough Bridge Auth.*, 297 N.Y. at 36; *City of N.Y. v. Cross Bay Contracting Corp.*, 662 N.Y.S.2d 462 (N.Y.A.D. 1997)), and that "the majority of bankruptcy courts, albeit none in this district, have concluded that retainage is not property of the debtor-contractor's estate where there has been a pre-petition default and a surety has stepped in under its bonds." *Id.* at 566 (citing *In re Pacific Marine Dredging & Constr.*, 79 B.R. (Bankr. D. Or. 1987); *In re Ward Land Clearing & Drainage, Inc.*, 73 B.R. 313 (Bankr. N.D. Fla 1987); *In re Modular Structures, Inc.*, 27 F.3d 72 (3d Cir. 1994); *In re Four Star Constr. Co.*, 151 B.R. 817 (Bankr. N.D. Ohio 1993)). The court reasoned that once the surety stepped into the shoes of the debtor-contractor to pay or complete on the debtor-contractor's behalf pursuant to its bonded obligations, "[w]hatever right the debtor had in the contract passed to the surety by virtue of the doctrine of subrogation, prior to bankruptcy," and therefore never became part of the debtor-contractor's bankruptcy estate. *QC Piping Installations, Inc.*, 225 B.R. at 568. The court summarily noted:

> The courts have been struggling with the new concept of "property of the estate" as defined under § 541 of the new Code.... [T]his new

> concept should not significantly affect the surety's rights in the
> bonded contract proceeds. The courts are for the most part finding
> that the surety in a bankruptcy situation has the right to see that the
> contract proceeds are first paid to those who created the fund
> (laborers and materialmen) and to reimburse the surety before the
> debtor can use them to pay other expenses or the funds can be paid
> to general contractors. In this context it may make little difference
> to the surety whether the proceeds are deemed property of the estate
> or not.

*QC Piping Installations, Inc.,* 225 B.R. at 571 (citing *Bankruptcy 1984, supra,* 20 Forum at 747).

55.     Based on the aforementioned controlling law, and as discussed in greater detail below, Atlantic's subrogation rights entitle Atlantic to a priority right in the Subcontract Balances and Atlantic's interest attaches to the Subcontract Balances before the Debtor has a right to them, such that the Subcontract Balances never become property of the estate. Thus, the Debtor has no equity in the Subcontract Balances.

56.     And even if the Contract Balances are property of the estate, Atlantic holds a superior right thereto, ahead of the rights of the Receiver, the Debtor and any secured party claiming a perfect security or other interest in accounts or contract rights.  Finally, if indeed there is any amount of the Subcontract Balances remaining due after Atlantic completes the Debtor's scope of work under the Subcontract, Atlantic has agreed to account to the Receiver and remit any excess to the Receiver.

**B.  Atlantic has a Superior Priority Right in the Subcontract Balances.**

57.     The longstanding recognized authority cited herein demonstrates and supports that a surety's right to the proceeds of the bonded contract is superior to the Debtor, the Trustee and any other creditor of the Debtor.

58.     Atlantic's rights are based upon (1) state and federal law holding that a surety possesses equitable interest in the proceeds of a bonded contract; (2) United Sates Supreme Court

and other Bankruptcy Court precedent holding that a surety's subrogation interest is superior to, and primes, the rights of all other creditors, including the trustee and secured lender; and, (3) various state statutory and case law authority where the projects are located requiring contract funds be held in trust for the benefit and use of the subcontractors and materialmen.

### i. Atlantic's Equitable Right of Subrogation to the Proceeds of the Bonded Subcontracts Prime the Rights of All Other Creditors

59.     For more than 100 years, the Supreme Court has recognized the priority of a surety's equitable rights, holding that the rights of a subrogated surety prime the rights of the debtor (contractor), its assignees and trustees in bankruptcy. *See e.g. Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962); *Henningsen v. United States Fidelity and Guaranty Co.*, 208 U.S. 404 (1908); *Prairie State National Bank v. United States*, 146 U.S. 227 (1896). As such, Atlantic is entitled to adequate protection to preserve its rights in the Subcontract Balances. The concept of adequate protection is designed to protect a surety's interests and where, as here, the Receiver and the Debtor are unable to provide any adequate protection to Atlantic, relief from the stay is appropriate under 11 U.S.C. § 362(d)(1).

60.     Subrogation is the substitution of one party in place of another with respect to a lawful claim or right so that the substituted party succeeds to the rights of the other. *QC Piping Installations, Inc.*, 225 B.R. at 562. The New York courts have long recognized and enforced the doctrine of subrogation, and describe the doctrine as follows:

> The right of subrogation or of equitable assignment is not founded upon contract nor upon the absence of contract, but is founded upon the facts and circumstances of a particular case and upon principles of natural justice, and generally where it is equitable that a person furnishing money to pay a debt should be substituted for the creditor or in place of a creditor such person will be so substituted ... "[n]o contract is necessary upon which to base the right, for it is founded upon principles of equity and benevolence and may be decreed where no contract exists.... It was said by Chief Justice Marshall that

> equity would clothe the party thus paying with the legal garb with
> which the contract he has discharged was invested, and it would
> substitute the party paying to every equitable interest and purpose,
> in the place of the creditor whose debt he has discharged."

*Pittsburgh–Westmoreland Coal Co. v. Kerr,* 220 N.Y. 137, 143 (N.Y.1917) (*quoting Pease v.*

*Egan,* 131 N.Y. 262, 272, 30 N.E. 102, 104 (1892)).

61. The doctrine of subrogation has repeatedly been applied in cases involving sureties

on construction contracts, and it arises by operation of law upon performance by the surety under

its payment or performance bond obligations. *See e.g., QC Piping Installations, Inc*., 225 B.R. at

562; *In re John's Insulation, Inc*., 221 B.R. 683 (Bankr. E.D.N.Y. 1998) (finding that after surety

satisfied its obligations under either performance or payment bond, it is subrogated to the rights of

the parties paid). Although arising after performance, the surety's equitable subrogation rights,

however, are deemed to relate back to the date of issuance of the bond(s) under which the surety's

performance arose. *Triborough Bridge Auth.*, 297 N.Y. at 36 (*"*To all rights under this contract the

bonding company was subrogated. The equity in favor of the surety company arose at the time of

the giving of its bond. The right became available when the surety company completed the work

at a loss…"). To be sure, "there are few doctrines better established than that a surety who pays

the debts of another is entitled to all rights of the person he paid to enforce his right to be

reimbursed." *Pearlman,* 371 U.S. at 136-37.

62. Three U.S. Supreme Court decisions are generally regarded as the predicate of the

surety's rights of subrogation. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37 (1962)*;*

*Henningsen v. United States Fidelity & Guaranty Co.,* 208 U.S. 404 (1908); *Prairie State Nat'l*

*Bank v. United States,* 164 U.S. 227 (1896). The U.S. Supreme Court has held a performing surety

is subrogated to the rights of three parties: (1) the principal; (2) the subcontractors and suppliers

17

the surety has paid, and; (3) the project owner. *E.g., Pearlman,* 371 U.S. at 136-37; *see also Nat'l Shawmut Bank,* 411 F.2d at 848.

63.     In *Prairie State Nat'l Bank,* the Supreme Court recognized a surety who completes performance is subrogated to claims the obligee may have had to the contract proceeds or retainage. 146 U.S. 227 (1896). In *Henningsen*, the Court recognized a surety who paid subcontractors and material suppliers has the same subrogation rights as a surety who completes performance. 208 U.S. 404 (1908). Importantly, the Court acknowledged the surety's subrogation rights are superior to those of a bank to whom contract proceeds may have been assigned as security for loans. *Id.*

64.     Finally, in *Pearlman,* the U.S. Supreme Court held that the rights of a payment bond surety prime those of a principal's bankruptcy trustee. 371 U.S. 132 (1962). The U.S. Supreme Court held that, because the obligee had a right to pay unpaid subcontractors from contract retainage, and the subcontractors had a right to be paid out of that fund, the surety which paid the subcontractors was entitled to receive the funds to reimburse itself. The U.S. Supreme Court recognized that the surety was subrogated to the rights of the owner as well as to subcontractors and suppliers.  *See also QC Piping Installations, Inc.,* 225 B.R. at 562–63 (reasoning that surety is subrogated to the rights of the project owner, debtor's subcontractor's and supplier and the debtor); *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 320 (5th Cir. 1967); *In re Alcon Demo. Inc.,*204 B.R. 440, 447 (Bankr. D. N.J.); *New Mexico State Hwy & Trans. Dept. v. Gulf Ins.*, 996 P.2d 424, 424 (N.M. Ct. of App. 1999).  The U.S. Supreme Court explained:

> We therefore hold in accord with the established legal principles stated above that the government had a right to use the retained funds to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the funds; that the contractor had he completed his job and paid his laborers and materialmen would have been entitled to the fund, and that the surety having paid the laborers and materialmen is entitled to the benefit of all these rights to the extent necessary to reimburse it.

*Pearlman,* 371 U.S. at 135-36.

65.    The principle that a surety can step into the shoes of three different parties is what

often causes confusion among other creditors.  Indeed, one court has noted:

> [L]ogic compels the surety to be assessed as merely one of the
> contractor's creditors, and to be subject to the system of priorities
> rationalized by the Uniform Commercial Code.  But the surety in
> cases like this undertakes duties which entitle it to step into three
> sets of shoes.  When, on default of the contractor, it pays all the bills
> of the job to date and completes the job, it stands in the shoes of the
> contractor insofar as there are receivables due it; in the shoes of the
> laborers and material men who have been paid by the surety --who
> may have had liens; and not least, in the shoes of the government,
> for whom the job was completed.

*Nat'l Shawmut Bank,* 411 F.2d at 845 (citing *Pearlman,* 371 U.S. at 140 n. 19).

66.    Indeed, in citing *Nat'l Shawmut Bank,* the court in *QC Piping Installations, Inc.,*

stated:

> In fact, when a surety performs under its bond, it "stands in the shoes"
> of the other parties to the construction project, and it undertakes
> duties which entitle it to step into three sets of shoes. When, upon
> default of the contractor, it pays all the bills of the job to date and
> completes the job, it stands in the shoes of the contractor insofar as
> there are receivables due it; in the shoes of laborers and materialmen
> who have been paid by the surety—who may have had liens; and
> not least, in the shoes of the government [owner], for whom the job
> was completed. *National Shawmut Bank v. New Amsterdam Cas.
> Co.,* 411 F.2d 843, 845 (1st Cir.1969); *In re Modular Structures,
> Inc.,* 27 F.3d 72, 74 n. 1 (3d Cir.1994); *In re John's Insulation, Inc.,
> supra,* 221 B.R. at 688. Courts have also acknowledged that a surety
> is subrogated not only to the rights of the project owner, but to the
> rights of the contractor. *See, e.g., Menorah Nursing Home, Inc. v.
> Zukov,* 548 N.Y.S.2d 702, 705, 153 A.D.2d 13, 17 (N.Y.A.D.1989)
> (the surety is subrogated "to any claims which the defaulting
> principal might have against third parties whose wrongful conduct
> allegedly was a cause of the *563 default ... [and] to the principal's
> right to contract payments which may have been retained by the
> owner-obligee" (citations omitted)).

*QC Piping Installations, Inc.,* 225 B.R. at 562–63. Further finding that *Pearlman* and its progeny were unscathed after consideration of Section 541 of the Bankruptcy Code, reasoned as follows:

> neither the contractor as a debtor or his trustee in bankruptcy acquire[d] any property interest in the unpaid contract proceeds (earned but unpaid, unearned, or retentions) to the extent those proceeds [were] necessary to reimburse the surety for its costs of completion and its payment of labor and material bills. Whether the surety's interest was characterized as an ownership interest, an equitable lien, or a prior right, this property interest could not be administered, liquidated, or distributed to the general creditors. It was not an asset of the estate.

*QC Piping Installations, Inc.,* 225 B.R. at 564.

67.     Many other bankruptcy courts and district courts have, by and large, applied the holding in *Pearlman* in cases decided under the Code. *E.g., In re John's Insulation, Inc.,* 221 B.R. 683 (Bankr.E.D.N.Y.1998) (holding that defaulting contractor was precluded from suing surety to recover retained contract proceeds, since surety was subrogated to owner's rights and contractor's rights, and has the right to contract payments of any retainage, earned but unpaid funds and unearned proceeds); *In re ADL Contracting Corp.,* 184 B.R. 436 (Bankr.S.D.N.Y.1995) (finding that surety's claim to proceeds of settlement of breach of contract suit between debtor-contractor and town was superior to claim of judicial lien creditor, though not to claim of unpaid subcontractor; since debtor claimed no interest in the funds, the court did not reach the issue of whether the retainage was property of the estate); *In re Wingspread Corp.,* 116 B.R. 915 (Bankr.S.D.N.Y.1990) (holding that guarantor of leases which paid post-petition rent to lessors upon debtor's default was entitled to assert all the lessor's rights, including its right to an administrative priority, by virtue of doctrine of subrogation); *In re Modular Struc.*, 27 F.3d 72 (3d Cir. 1994); *In re Fegert*, 88 B.R. 258, 260 (9th Cir. Bankr.1988), *aff'd*, 887 F.2d 955 (9th Cir.1989);

*In re Pacific Marine Dredging,* 79 B.R. 924, 928 (Bankr. D. Or. 1987); *Board of Trustees of the Univ. of Illinois v. USF&G*, 1991 WL 127589 (N.D. Ill. July 13, 1991).

68.     Accordingly, Atlantic not only has an interest in the Subcontract Balances on the Bonded Projects, its interest primes all the rights of the Receiver, the Debtor and all other creditors.

### ii. Atlantic's Rights Are Not Governed by Article 9 of the Uniform Commercial Code

69.     It has long been settled that a surety's rights are not governed by the UCC and UCC filings are not required to perfect those rights. Since a surety's subrogation rights are equitable in nature and arise as a matter of law, a surety is not required to "perfect" its subrogation interest under the UCC. *See e.g., Gen. Ins. Co. of Am. V. Mezzacappa Bros*., No. 01-CV-7394, 2003 WL 22244964 at *4 (E.D.N.Y. Oct. 1, 2003)("it is established law that the UCC does not displace the surety's subrogation rights – that is, the surety's right to stand in the shoes of its insured once surety has performed its obligations under a bond) (*citing Nat'l Shawmut Bank*, 411 F.2d at 848) (holding that UCC Article 9 does not affect a surety's right to equitable subrogation); and *Amwest Surety Insur. Co. v. United States*, 870 F.Supp. 432, 434 (D. Conn. 1994) (rejecting attempt to apply the UC to surety's equitable subrogation claim, after noting that "[t]here is no reference in the UCC to sureties," and that a "surety claim is [not] derived from…the ordinary financing contemplated by UCC Article 9."); *In re Comcraft, Inc*. 206 B.R. 551 (Bankr. D. Or. 1997); *In re Larbar Corp.*, 177 F.3d 439 (6th Cir. 1999); *In re Alcon Demo., Inc.,* 204 B.R. 440, 447 (Bankr. D. N.J. 1997).

70.     Atlantic has paid, and will likely be required to pay, numerous vendors of the Debtor in order to discharge its obligations under the Bonds.  Thus, Atlantic possesses an interest in the Subcontract Balances which is superior to a secured lender or trustee by operation of law, which are unaffected by the provisions of Article 9 of the UCC.

**C.  Request to Waive 14-Day Stay Pursuant to Rule 4001(a)(3)**

71.     The Movants respectfully request that the 14-day stay that is provided for under Bankruptcy Rule 4001(a)(3) be waived.

72.     As outlined in more detail above, delay in obtaining the relief from stay as requested will cause unnecessary and irreparable harm to Atlantic, Kiewit, and the Project owner in the form of additional costs, further Project delays, delay damages, and increased claims against the estate.

**D.  Conclusion**

For the foregoing reasons, the Movants respectfully request that the Court enter an order:

(1) modifying the automatic stay to permit Kiewit to issue any required notice or notices of default and to take such additional action or actions as may be necessary to terminate the Subcontracts, as defined *infra*, between itself and Innova Global, Inc., one of the debtors in these cases ("Debtor" or "Innova"), or to take such other actions with respect thereto as may be necessary and appropriate to invoke and facilitate the exercise of Kiewit's rights under the Bonds, as defined *infra*;

(2) modifying the automatic stay to permit Atlantic to complete the Debtor's remaining scope of work under the Subcontracts pursuant to Atlantic's rights and obligations under the Subcontracts, Bonds, as defined *infra*, Indemnity Agreement, as defined *infra*, and law;

(3) modifying the automatic stay to permit Atlantic to utilize the Subcontract Balances, as defined *infra*, to complete the Debtor's remaining scope of work under the Subcontracts pursuant to Atlantic's rights and obligations under the Bonds, Subcontracts, Indemnity Agreement and law;

(4) modifying the automatic stay to permit Atlantic and/or Kiewit to contract directly with the Debtor's existing subcontractors and/or suppliers to engage the latter to complete the Projects, as defined *infra*;

(5) modifying the automatic stay to permit Kiewit to pay Atlantic the Subcontract Balances pursuant to the Movants' respective rights and obligations under the Bonds, Subcontracts and law;

(6) entitling Atlantic to pursue affirmative claims and assert all of the Debtor's rights in and under the Bonded Subcontracts.

22

(7) entitling Kiewit to assert any defenses to any such claims and to assert any pending or future back charges and any pending or future claims and rights under the Subcontracts.

(8) requiring Atlantic, after it discharges its obligations under the Bonds for the Projects and upon release of Atlantic's Bonds, upon request by the Receiver, to provide an accounting as to the payments it made and any Subcontracts Balances received by Atlantic; and

(9) ordering that there be no 14-day stay of this Court's order modifying the automatic stay.

## NOTICE OF OPPORTUNITY FOR HEARING

**Your rights may be affected. You should read this document carefully and consult your attorney about your rights and the effect of this document.** If you do not want the Court to grant the requested relief, or you wish to have your views considered, you must file a written response or objection to the requested relief with the Clerk of the United States Bankruptcy Court for the Northern District of Oklahoma, 224 South Boulder, Tulsa, Oklahoma 74103 no later than 14 days from the date of filing of this request for relief. You should also serve a file-stamped copy of your response or objection to the undersigned movant/movant's attorney [and others who are required to be served] and file a certificate of service with the Court. If no response or objection is timely filed, the Court may grant the requested relief without a hearing or further notice. **The 14 day period includes the three (3) days allowed for mailing provided for in Fed. R. Bankr. P. 9006(f).**

Dated May 13, 2019

/s/ Andrew R. Turner
Andrew R. Turner, OBA #9125
CONNER & WINTERS, LLP
4000 One Williams Center
Tulsa, Oklahoma 74172-0148
(918) 586-8972, fax (918) 586-8672
aturner@cwlaw.com

Attorneys for Movant
ATLANTIC SPECIALTY INSURANCE
COMPANY

/s/ Carson K. Glass
Steven W. Soule, OBA #13781
Carson K. Glass, OBA #32783
HALL, ESTILL, HARDWICK, GABLE,
GOLDEN & NELSON, P.C.
320 South Boston Avenue, Suite 200
Tulsa, OK  74103-3706
Telephone:  (918) 594-0400
Facsimile:  (918) 594-0505

23

Email:  ssoule@hallestill.com
           cglass@hallestill.com

-and-

Neal Wolf (*pro hac vice* pending)
California Bar No. _____
HANSON BRIDGETT
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (915) 995-5015
Facsimile:  (915) 995-3411
Email: nwolf@hansonbridgett.com

Attorneys for Movant
KIEWIT POWER CONSTRUCTORS CO.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2019, a copy of the foregoing instrument was served by CM/ECF upon the following:

John E. Howland
Steven A. Pierce
Attorneys for the Receiver

Chad J. Kutmas
Attorney for CB&I North Carolina, Inc.

Lyle R. Nelson
Attorney for Tenn. Gas PL, Sierrita Gas PL & El Paso Natural Gas Co.

Kyle L. Dickson
Attorney for GP East LLC

Christopher B. Woods
Attorney for Samuel, Son & Co. (USA) Inc.

Duane Brescia
Attorney for Epicor Software Corp.

Alexander Sokolosky
Attorney for Crowe & Dunlevy

Marvin E. Sprouse III
Attorney for Industrias Metalicas de Monclova SA de CV

Brian A. Kilmer
Attorney for Shoffnerkalthoff MES, Inc.

Steven W. Soule
Carson K. Glass
Attorneys for Kiewit

and upon such other entities as were listed in the CM/ECF system at the time of filing, which includes all parties having filed an Entry of Appearance/Request for Notices in the case through the date hereof.

In addition, I certify that on May 13, 2019, a filed copy of the foregoing instrument was mailed by regular mail, postage prepaid, to:

Alberta Treasury Branch
W. Twr, 8th Ave Pl, #600

585 8th Ave SW
Calgary, Alberta, Canada T20 1G1

   In addition, I certify that on May 13, 2019, I sent a filed copy of the foregoing instrument by email to:

Walker W. MacLeod
McCarthy Tetrault LLP
wmacleod@mccarthy.ca
Attorney for ATB Financial

Jeremy Ryan
Potter Anderson Corroon LLP
jryan@potteranderson.com
Attorney for ATB Financial

R. Stephen McNeill
Potter Anderson Corroon LLP
rmcneill@potteranderson.com
Attorney for ATB Financial

Edward Ripley
King & Spalding LLP
eripley@kslaw.com
Attorney for ATB Financial

Neal L. Wolf
Hanson Bridgett LLP
nwolf@hansonbridgett.com
Attorney for Kiewit

         /s/ Andrew R. Turner